Harry L. WASHBURN, Appellant,

v.

The STATE of Texas, Appellee.

No. 29674.

Court of Criminal Appeals of Texas.

June 25, 1958.

On Second Motion for Rehearing
Dec. 17, 1958.

628

Robert C. Benavides, Charles W. Tessmer, Dallas, Clifton H. Tupper and Clyde Vinson, San Angelo, for appellant.

Justin Kever, Dist. Atty., San Angelo, Henry Wade, Dist. Atty., Dallas, Runge, Hardeman, Smith & Foy, Earl W. Smith, San Angelo, of counsel, and Leon B. Douglas, State's Atty., Austin, for the State.

DAVIDSON, Judge.

This is a conviction for the murder of Helen Harris Weaver, with punishment assessed at ninety-nine years in the penitentiary.

The case has been twice before this court, the first time upon the question of bail (Ex parte Washburn, 280 S.W.2d 257) and then upon the former appeal (299 S.W.2d 706).

This prosecution was brought and conviction obtained upon that proposition of law which says that one intending to commit a felony and who in the act of preparing for or executing the crime shall, through mistake or accident, do another act which if voluntarily done would be a felony shall receive the punishment affixed to the felony actually committed. Art. 42, Vernon's Ann.P.C.

The indictment charged that appellant " * * * did voluntarily and with malice aforethought kill Helen Harris Weaver by causing a bomb, to-wit: a collection of dynamite and electrical detonating caps, to be attached to the electrical system of an automobile in such manner that an attempt to start the motor of said automobile and put said automobile in use would cause an explosion, and did then and there and thereby cause said bomb to explode when the said Helen Harris Weaver attempted to start said motor of said automobile and put said automobile in use, and the explosion of said bomb, so attached and caused to explode, in the manner aforesaid, did

then and there kill the said Helen Harris Weaver * * *."

We are met with the contention that the indictment is fatally defective because in the same count it charges appellant with being both a principal offender in and an accomplice to the murder of Helen Harris Weaver.

█ Of course one can not be both a principal and an accomplice to the commission of the same offense.

█ Appellant insists that the use of the words "causing a bomb * * * to be attached to * * * an automobile" is to be given the meaning that he secured another to attach the bomb to the automobile under the circumstances alleged and that such constituted him an accomplice to the crime committed.

The statute, Art. 70, P.C., sets out four fact situations by and through which one may become and is an accomplice to the commission of a crime by another.

Under that statute it has been the long and continued holding of this court that an accomplice must be indicted as such and that the indictment must charge the principal with the crime and then charge the statutory act or acts which constitute the accused an accomplice thereto. The authorities so holding will be found under Note 35 of Art. 70, Vernon's Ann.P.C.

It can not be said, therefore, that the mere allegation that appellant caused a bomb to be attached to the automobile charged that he was an accomplice to the murder.

Moreover, an accused can cause another to commit a crime and be a principal thereto. Art. 68, P.C.

We are unable to agree that the indictment was subject to the objection urged.

The former conviction in this case was reversed because of the error in connection

with the calling of and the failure of the coindictee, Andrew H. Nelson, to testify.

Upon the instant trial, Nelson did testify after having been given by the state full and complete immunity from prosecution in the case.

■ It was the province of the state to grant immunity, and the election of Nelson to testify. The appellant had no right to object thereto.

■ Appellant very ingenuously argues that, with full and complete immunity from any and all acts growing out of the charge and accusation relative to the death of Helen Harris Weaver, Nelson was, when testifying, under no restraint nor the pains and penalties of perjury.

We are unable to agree with appellant that such is true. When the state granted Nelson immunity from prosecution it did not thereby license him to lie or to commit perjury as a witness. When testifying as a witness, Nelson was under all the restraints of perjury.

Appellant's contention that the facts are insufficient to warrant his conviction, and also the questions in the case which are presented for review require a statement of the facts:

The deceased, Helen Harris Weaver, who was the wife of Harry Weaver, was fifty-one years of age at the time of her death and possessed of a considerable estate consisting of separate and community property. The Weavers had been married sixteen years at the time of her death. They had no children of that union. Each had children by a former marriage.

The appellant, Harry L. Washburn, married a daughter of the deceased and they had two children. Some time prior to the death of Mrs. Weaver, appellant and his wife separated and a divorce followed. Appellant was awarded the care and custody of the children. The were in his custody at the time of the killing.

The Weavers made their home on a ranch near San Angelo. At the time of Mrs. Weaver's death, however, and for some time prior thereto they resided in the home of Mrs. Harris, the mother of deceased.

The Harris home, a large two-story edifice, was situated on one of the principal streets of San Angelo and near the business section of that city. Across the street from the home was a filling station operated by the witness Lamb.

It was the state's contention that the appellant concluded that Harry Weaver stood in his way and was a bar to his obtaining money from the deceased by extortion and intimidation and that such conclusion formed the motive to kill Harry Weaver.

For the purpose of showing the plan, purpose, and intent of the appellant to extort money from the deceased, the state proved the following:

About two o'clock, a. m., on April 23, 1951, which was almost four years before the death of Mrs. Weaver in January of 1955, the witness Weaver awoke to find appellant standing at the foot of the twin beds in his and deceased's bedroom and holding a gun in each hand, one of which guns belonged to Weaver and had been kept in a night stand between the beds. Appellant demanded a check for $20,000 from the deceased, threatening to take her life if she refused. Weaver reasoned with appellant, as follows:

"* * * after Mrs. Weaver is— after we are dead you won't be able to cash any check any more and they will suspect you [of the killing]."

Weaver suggested as a compromise a cash payment from the deceased "as soon as she can get it" and the doubling of the $250 monthly payment which had been stopped several months earlier by her. Mrs. Weaver agreed to this, and appellant consented to put the guns down and leave the house, exacting of Mrs. Weaver, however, a promise to try to "* * * make

the little girl [deceased's daughter and appellant's former wife] come back and live with [him]," and further saying:

"If either one of you tell a soul I have been out here, I will come back and kill you both."

The matter seems to have stopped there, and appellant left.

The witness McKinnis testified that he and another person, at appellant's hiring, agreed to kill Weaver, for which appellant paid them certain sums of money in advance. Among the instructions given them by appellant was that they were to go to the home of Harry Weaver near San Angelo and shoot him with a gun. The agreement was never carried out. It appears that McKinnis was interested in the enterprise only to get what money he could from the appellant. According to the witness's testimony, this occurred something like nine or ten months prior to the explosion.

The witness Gidley testified that at appellant's hiring she endeavored to lure Harry Weaver to come to Houston.

In April of 1954, prior to the killing January 19, 1955, appellant contacted the witness Andrew Nelson, who was also indicted for the murder of the deceased. Nelson testified that appellant inquired of him if he knew of anyone he could get to kill a man. Nelson said he knew of no one, explaining that he had been out of contact with the criminal element for several years. In August following, appellant again contacted Nelson and told him that he had a man in West Texas he wanted killed. Nelson replied that he was not interested. The following November appellant again contacted Nelson, the occasion for that contact being that appellant made his (Nelson's) bail bond.

About four days thereafter, appellant again contacted Nelson and on that occasion asked him "to go out to Robert Lee and shoot a man named Weaver on his ranch home at his ranch house" and offered him $10,000 if he would do so. Again Nelson refused.

About a month thereafter, on December 29, appellant asked Nelson if he knew where he could get some "nitro gel or dynamite." Nelson knew of no place.

On January 13, 1955, six days before the killing, appellant called Nelson over the telephone and asked him if he would go with him for a ride. Nelson agreed, and appellant later picked him up. Appellant told Nelson he had found where he could purchase dynamite and that he wanted him to buy it for him. Nelson agreed, and they drove to the place designated by appellant. Nelson purchased a case of dynamite and a case of dynamite caps with money furnished by appellant. While appellant waited in the car the dynamite and caps were placed therein. Appellant and Nelson then drove to appellant's home, where he got some wire and a hammer from his garage. From there they drove out into the country from Houston into a woody and brushy area. There they began to experiment as to how the dynamite could be exploded, by attaching wires to the ignition system of the automobile. Their first efforts failed but they finally solved their problem and successfully exploded dynamite by pushing down the starter button on the automobile.

Appellant and Nelson then returned to Houston. Five days thereafter, on January 18, 1955, the day before the killing, appellant called Nelson and asked if he and his wife would come over to his home and take care of his children, as he was going out that night. Nelson agreed, and he and his wife were picked up by appellant and taken to his home. Nelson last saw appellant on that occasion about two o'clock the afternoon of January 18, 1955, when he drove away from his house.

Nelson next saw the appellant about seven o'clock the morning of January 19, 1955, sitting on the side of his bed and clad

in his pajamas. Appellant had breakfast and carried his children to school, returning home about nine o'clock. Later, appellant drove Nelson and his wife home.

Over a radio in the car there was a news report that Mrs. Helen Weaver had been killed in an automobile explosion. Appellant exclaimed, " 'My God, that's the wrong one.' " Nelson said to appellant, " 'Harry, is that your job?' " Appellant replied, " 'Yes.' " To Nelson's inquiry, " 'How did you do it?' " appellant replied, " 'I took a dozen sticks of that dynamite and put it in a sack and put it on the back of the motor.' " Nelson said, " 'Harry, that's murder, you better play it cool,' " to which appellant replied, " 'I better get me a job digging ditches.' "

The foregoing is taken chiefly from the testimony of the accomplice witness Andrew Nelson.

The following is taken from the testimony of Weaver:

On January 13, 1955, Harry Weaver and the deceased left San Angelo for Houston traveling in a green Chevrolet four-door automobile. The purpose of the visit was dual, to see about an income tax matter and to visit with the deceased's daughter and her husband. They arrived in Houston on January 14. On the morning of January 17, Weaver, driving the green Chevrolet on the streets of Houston, passed appellant's home and saw appellant standing at the door of his garage.

Weaver and the deceased left Houston the next day for San Angelo, arriving there that afternoon around 4:30 or 5 o'clock. Later they had dinner at a hotel, each, however, traveling in separate automobiles, as deceased planned to visit with her mother at the hospital before returning home. Deceased drove the green Chevrolet. Weaver returned home first and parked in the driveway. Driving in later, the deceased parked her car behind Weaver's. They retired about nine o'clock that night.

At approximately 7:30 o'clock the next morning, January 19, 1955, after breakfast, Weaver went to the green Chevrolet to transfer some files and tools from the trunk thereof, as well as a gun and a kodak and some films, to another car. About the time the transfer was completed Weaver felt an urgent call of nature, and returned to the house.

For the purpose of going to the hospital and to the beauty parlor, deceased came out of the house and got into the green Chevrolet. When she started the motor a terrific explosion occurred under the hood of the car, as a result of which deceased was mortally wounded and lived only a short time thereafter.

In addition to the foregoing and to connect appellant with the explosion, there was evidence tending to show that dynamite was used; that the cap or caps used were similar to those purchased by Nelson for the appellant; and that some wire found at the explosion was of like kind to that found in the appellant's garage in Houston.

There was testimony corroborating the testimony of the accomplice Nelson that he purchased the dynamite and caps and that he and appellant experimented with firing and exploding the caps in the woods near Houston, and that appellant was in Houston on the afternoon of January 18, 1955, the day before the killing.

The witness Clayton, service station attendant in San Angelo, testified that between 9:30 and 10:00 o'clock the night of January 18, 1955, "a '52 Ford Victoria, black top with a red bottom" was hurriedly driven into the station and he was directed by the driver to "fill it up." The car was then driven from the station in a direction that would eventually lead to Houston, Texas.

The witness would not identify the appellant as the driver of that car. He did say, however, that the driver thereof looked like the appellant and that the car re-

sembled that which had been identified by other testimony as belonging to the appellant.

Later, at 4:30 o'clock on the morning of January 19, 1955, appellant was arrested for a traffic violation in the city of Columbus, Texas, a distance of something over three hundred miles from San Angelo. According to the testimony of the arresting officer (Ginn), he was driving a 1951 Ford automobile "black over red" and no one was with him.

Appellant was next seen in Houston at 7:00 o'clock that morning, by Nelson.

It is upon the above testimony that the state depends, primarily, to sustain this conviction.

It may be stated, therefore, that it is the state's case that appellant left Houston on the morning of January 18, 1955, drove to San Angelo, planted the dynamite and caps in the green Chevrolet automobile which he had seen Weaver driving in Houston, and attached wires to the electrical system so that the dynamite would explode when the starter switch was turned on—all of which had been completed prior to his stopping at the filling station, at 9:30 to 10:00 o'clock that night, where the witness Clayton was employed, and all of which was with the purpose and intent of killing Harry Weaver but by mistake resulted in the death of Mrs. Weaver.

The appellant did not testify as a witness in his own behalf.

Appellant insists that the facts stated do not warrant the conclusion of his guilt and that the circumstances do not exclude every other reasonable hypothesis save and except his guilt.

In that connection attention is called to the testimony of the witness Lamb, who operated a filling station across the street from the Harris home, about one hundred fifty feet away. He was well acquainted with Harry Weaver and his wife and regularly serviced their cars. He knew when they left for Houston. The filling station was equipped with flood lights which illuminated the station and driveway into the station as well as the Weaver driveway. A street light was on the corner of the block. Lamb was on duty at the station on the night of January 18, 1955, the night before the explosion. He came to work earlier in the evening and closed the station at 10:00 o'clock that night. During that time he saw no one around the green Chevrolet or any other of the automobiles in the Weaver driveway. He did not see the Weavers when they came home that night.

Appellant insists that, from this testimony, the bomb was necessarily placed in the automobile after 10:00 o'clock, when Lamb closed the filling station.

Lamb came to work about 7:00 o'clock the next morning, which was the morning of the tragedy, and opened the station. He saw Harry Weaver come out of the house and go to the green Chevrolet, move some things from the trunk of the car into another car, and then return to the house. Mrs. Weaver came out of the house about 9:00 o'clock and got into the green Chevrolet. When she turned on the starter switch, the explosion occurred.

Appellant relies heavily upon that testimony as suggesting that Harry Weaver placed the dynamite in the electrical connection of the automobile.

Throughout the trial of the case, the appellant, by cross-examination of the witnesses, sought to show that Harry Weaver had a motive for killing his wife in that he would be a beneficiary of some of her separate estate under her will, and that he had ample opportunity to place the dynamite in the automobile.

There is an entire absence, however, of any direct evidence to that effect. At most, the facts go no further than to raise a suspicion.

Another series of facts shown by the testimony which the appellant stresses are those which tended to show that he was in San Angelo at the filling station at 9:30 o'clock the night of January 18, and at 4:00 o'clock thereafter was in Columbus, approximately three hundred miles distant. In connection therewith appellant introduced evidence tending to show that the tires on his automobile were in such condition that they could not stand the continuously high speed that would have been required to make such trip.

Finally, under such facts appellant insists that the period elapsing between the time deceased returned from the hospital to her home until he was seen at the filling station by the witness Clayton was of such short duration as to preclude his (appellant's) placing the dynamite in the car and making the electrical connection, and, further, that the witness Lamb did not see any one around the automobile on the Weaver driveway during that time.

It is the duty of this court to determine if the facts authorize the jury to conclude that appellant committed the crime.

Of outstanding importance in reaching that conclusion is the effect of the testimony of the accomplice witness Nelson. By that testimony he showed appellant to be guilty of planning the murder of Harry Weaver, by explosion as actually employed in the killing, and showed the purchase of the dynamite and caps, with money furnished him by the appellant, at appellant's instance, and the experiment, conducted in the woods near Houston, in exploding the dynamite by automobile ignition.

Other features of the testimony of the witness Nelson are not corroborated: such as the threats of the appellant and his endeavor to get him to kill Harry Weaver and the statements of appellant the next day.

■ It must be remembered, in this connection, that the testimony of the accomplice witness Nelson did not show appellant to be guilty of the offense charged. Appellant's confession or admissions to Nelson, being uncorroborated, did not do so.

■ As to the material facts testified to by the accomplice and not directly corroborated by other testimony, all the facts and circumstances in evidence may be looked to as furnishing the corroboration necessary.

It is the combined effect of all the testimony outside that of the accomplice that is looked to in making that determination. Eliminating from consideration the evidence of the accomplice, if the inculpatory testimony tends to establish the guilt of the accused, the accomplice witness is corroborated. Story v. State, 153 Tex.Cr. R. 541, 221 S.W.2d 917; Alexander v. State, 160 Tex.Cr.R. 460, 274 S.W.2d 81.

■ Applying that test, here, the conclusion is reached that the jury were authorized to conclude that appellant committed the murder of Helen Harris Weaver, by attaching a dynamite bomb to an automobile with the intention of killing Harry Weaver and thru accident and mistake killing the deceased.

Upon the presentation of its case in chief, the state introduced photographs of the bombed automobile in evidence.

Appellant contends that the photographs were inflammatory and prejudicial and that they should have been held inadmissible under the same rule of law which prohibits the introduction of bloody clothing worn by the deceased.

The photographs were not in color and the conclusion that the spots shown on the car and on the seat cushions were blood stains is the result, therefore, of deduction rather than a determination from sight or color.

It was the province of the state to show how the deceased came to her death, and in doing so to show the bombed and mangled automobile.

In addition thereto, the terrific force of the explosion and the damage done to the automobile tended to corroborate the testimony of the accomplice Nelson that appellant told him he used twelve sticks of dynamite therein. The mangled condition of the automobile tended to corroborate that testimony.

■ We are unable to agree that the photographs were not admissible in evidence or that they came within the rule prohibiting the introduction of inflammatory evidence.

In connection with the introduction of the pictures, the record reflects that a glass jar containing what were purported to be pieces of flesh and skin removed from the body of the deceased was brought into the courtroom. Neither the jar nor its contents were admitted in evidence before the jury, the trial court having sustained appellant's objection thereto.

It is appellant's contention that the jar was permitted to remain in the courtroom and that he was prejudiced thereby.

■ If the jar and its contents were not to be received in evidence, as the trial court ruled, the jar should not have been permitted to remain in the view of the jury. We are not in position, however, to hold that such fact constitutes reversible error, because of the testimony of witnesses for the state that the deceased came to her death as a result of an explosion of dynamite and that such an explosion would leave evidence of nitrates. The testimony of the witnesses for the state was that the skin of deceased disclosed the presence of nitrates. Such testimony was admissible in establishing the allegations of the indictment that death was caused by an explosion of dynamite.

Appellant introduced the testimony of witnesses showing that the tires on his automobile at, during, and after the time of the commission of the alleged offense were in worn and unsafe condition, upon the theory that the tires would not have stood the trip from Houston to San Angelo and return within a period of approximately twenty hours, especially at the high rate of speed the automobile would have had to travel from the time it was last seen in San Angelo until it was apprehended in Columbus. There was no limitation or restriction of the description the witness gave as to the condition of the tires.

In addition to the testimony of the witnesses as to such worn condition of the tires, appellant sought to introduce in evidence the tires, themselves, for the jury's inspection.

The state's objection thereto was sustained, because the trial court was of the opinion that the tires had not been properly identified.

■ Visual, real, or demonstrative evidence, regardless of which term is applied, is admissible upon the trial of a criminal case if it tends to solve some issue in the case—that is, if it has evidentiary value.

Of necessity, such contemplates that the articles sought to be exhibited to the jury must be shown to be properly identified and relevant as against any idea of speculation, conjecture, or presumption. 18 Tex.Jur., Evidence—Criminal Cases, Sec. 203, p. 329; 20 Am.Jur., Evidence, Secs. 716–18, pp. 600–601. A certain amount of discretion as to the receipt in evidence must rest in the trial court.

In this connection it must be remembered that proof of any collateral facts or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute is not admissible. 18 Tex.Jur., Evidence—Criminal Cases, Sec. 18, p. 32.

The tires, of and within themselves, proved only that they were tread-worn and slick. They did not tend to establish any issue in the case. If they were admissible, then it was because when taken

in connection with other facts they tended to establish some issue in the case.

If the tires appellant sought to introduce in evidence were those which were on his automobile when the alleged trip was made, then the tires did stand the trip, for they were on the automobile when he was arrested at Columbus and for some days thereafter at Houston.

The inference that the tires did, in fact, stand the trip is far stronger than any inference that they would not have stood the trip, because of the effect that must be given the testimony of Clayton.

On the other hand, we have no evidence as to where appellant's automobile was, with those tires thereon, during that period of time, nor is there any evidence of the usage and treatment the tires received from the time appellant was apprehended at Columbus until some days thereafter when the tires were found on the automobile which was owned by him and afterward passed into the possession of another. There is no explanation as to the usage and travel to which the tires were subjected during that period of time.

For aught this record reveals, the tires may have been subjected to and may have withstood far more usage and travel after possession passed into another than involved in the trip from Houston to San Angelo and return—which latter trip the state contends was made.

■ We are constrained to agree with the trial court that the tires were not sufficiently identified, nor their usage and treatment after the alleged incident accounted for, to authorize their introduction in evidence.

In this connection we can not lose sight of the danger calculated to follow the introduction of real, visual, or demonstrative evidence, especially where the item or thing exhibited does not, of and within itself, establish any fact and the evidentiary value or relevancy thereof is made to depend upon the individual viewpoint or opinion of someone.

It must be remembered that one of the grounds for setting aside a jury's verdict is that the jury received other and additional evidence during deliberations. Art. 753, Vernon's Ann.C.C.P.

In the exercise of his discretion, the trial court could have sensed the danger that could easily arise by permitting the jury, during their deliberations, to examine and inspect the tires and, from that examination and inspection, relate personal opinions and experiences, all calculated to constitute other and new evidence during deliberations and to set aside any verdict the jury might have otherwise reached.

Under such circumstances, we are constrained to conclude that reversible error is not reflected in the refusal to permit the appellant to offer the tires in evidence, and that the trial court did not err in excluding the tires from the jury.

■ Appellant insisted that the witness McKinnis and the witness Gidley were accomplice witnesses as a matter of law or as a matter of fact, and that the jury should have been instructed that he could not be convicted upon their uncorroborated testimony.

These witnesses were not shown to have been in any manner connected with or to have participated in the crime here charged. Prior thereto, the witnesses may have entered into a conspiracy with appellant to kill Harry Weaver but, if such were true, that conspiracy had terminated.

In any event, it is not shown that the witnesses McKinnis and Gidley were criminally connected with the killing of Helen Harris Weaver.

If a state's witness had no complicity in the offense for which an accused is on trial, his testimony is not that of an accomplice, whatever may have been his complicity with the accused in the commission

of other offenses. Ham v. State, 4 Tex. App. 645.

We are unable to agree that the witnesses McKinnis and Gidley were accomplice witnesses or that the evidence raised such an issue of fact.

 It is contended that the facts call for a charge upon alibi and that the trial court erred in refusing to give such charge.

A charge upon alibi is not required if the evidence as to the presence of the accused at the time of the commission of the crime or his evidence as to where he was at the time is not inconsistent with the state's claim that the defense of alibi is not presented. Hardin v. State, 57 Tex. Cr.R. 401, 123 S.W. 613; Basham v. State, 118 Tex.Cr.R. 29, 42 S.W.2d 261.

Here, the only testimony tending to show that appellant was not in San Angelo the night before the explosion is that he was seen in Houston on that day and then later that night was seen in Columbus.

Such evidence, however, is not inconsistent with the state's evidence showing that at another time he was in San Angelo. As the state contended, he could have been in both places.

The charge of alibi was not necessary.

At the motion of the state, several prospective jurors were excused because they had conscientious scruples against the infliction of the death penalty as punishment for crimes where the guilt of the accused depended upon circumstantial evidence.

It is appellant's contention that this was not a case of circumstantial evidence and that the trial court therefore erred in sustaining the challenge by the state.

The conclusion is expressed that this is a case of circumstantial evidence and that the trial court correctly so recognized in his charge to the jury.

As we have heretofore pointed out, the testimony of the accomplice witness Nel-son did not remove the case from the classification of circumstantial evidence.

 Appellant insists that the testimony showing his assault upon Harry Weaver and his wife and the attempted extortion was inadmissible because it showed the commission by him of another and extraneous offense and that it was too remote in point of time.

When taken into consideration with all the other facts and circumstances in the case, the testimony was admissible as showing the relationship of the parties and the motive which continued until the time of the killing. We are unable to agree that proof of such facts was not admissible.

During the cross-examination of the witness Harry Weaver, the appellant endeavored to prove by him that after the killing he (Weaver) was approached relative to his (Weaver's) taking the so-called lie detector or polygraph test as to any criminal connection on his part with the death of his wife, and that he refused to take the test.

Appellant insists that he was entitled to make proof of such refusal on the part of Weaver.

This court has not recognized as a reliable medium of evidence and has refused to admit over objection the result of such a test. In that connection, we have also refused to permit proof of the fact that the accused refused to take such a test.

 Such rule would also be applicable in the case of a witness.

It must be remembered that it was the appellant, and not Weaver, who was here on trial for killing the deceased.

Other matters presented in appellant's brief have been considered and are overruled without discussion.

The judgment is affirmed.

WOODLEY, Judge (concurring).

Because the other Judges of this Court are unable to agree, it becomes the duty of the writer to participate in the disposition of this appeal, though he refrained from doing so on the former appeal.

The exclusion of the tires identified as Defendant's Exhibit 44 raises the most serious question on the appeal.

Five tires constituted this exhibit which the court excluded because the tires were not sufficiently identified as the tires that were on appellant's car on the 18th and 19th of January, 1955.

This Court would not be authorized, under the facts, to hold that the trial court erred in requiring further identification of the tires before permitting them to be exhibited to the jury.

This is especially so in view of the fact that the undisputed evidence shows that one of the five tires was never on appellant's automobile.

I concur in Judge DAVIDSON'S opinion affirming the conviction.

MORRISON, Presiding Judge (dissenting).

I would reverse this conviction for the following reasons:

1. The State in making out its case in chief introduced seven closeup pictures of the bombed automobile. Three of them were clearly admissible, were not objected to, and showed the full extent of the bomb damage. The other four added nothing to the three except that they showed blood which had streamed from the seat where Mrs. Weaver had been seated and formed a great pool on the ground. Under the many holdings of this Court, recently reaffirmed in Hunter v. State, 161 Tex.Cr. R. 225, 275 S.W.2d 803, and Davis v. State, Tex.Cr.App., 308 S.W.2d 880, blood and bloody clothing are inadmissible unless they solve some issue. These four pictures helped to solve no issue not already clearly solved by the other pictures and should have been excluded.

2. The prosecution brought into the courtroom and placed on the counsel table a jar which contained a portion of the flesh of the deceased. I can imagine nothing more inflammatory or likely to lead the jury away from a calm and deliberate consideration of the issues before them. Would it not be human for a juror confronted with such a spectacle to say, "I had some doubt as to the guilt of the accused, but it was such a horrible crime that I could not bring myself to vote for an acquittal." The State's contention that the jar was not exhibited before the jury cannot be accepted. The record contains a picture taken during the trial which shows the jar clearly visible to all in the courtroom.

3. The appellant offered into evidence the tires which were shown to have been on his automobile both before and after the homicide. The State's contention that they were not properly identified cannot, as I view the record, be sustained. In this connection, I note that there was no issue made as to the identity of the tires, and quote from 18 Tex.Juris., sec. 204, pp. 331 and 332, "The prevailing view, however, is that a proffered object is not to be rejected because it is not positively identified as the thing which is shown to have been connected with the commission of the crime or to have been in the possession of the accused, the lack of positive identification affects the weight of the article or substance as evidence rather than its admissibility." See also the recent opinion of this Court in Wilson v. State, 289 S.W.2d 597. The appellant offered the tires, and I agree they were admissible, to show, if the jury so found from examining them, that they could not have been driven at the high rate of speed which the time schedule in the State's case would have required. It should be remembered that no one swore that the appellant was in San Angelo on the night in question, and the tires were

admissible to support his contention that he was not. "All articles or objects which have any connection with the crime of which are found * * * in the possession of the defendant are admissible in evidence." Branch's Ann.P.C., 2d Ed., Vol. 4, sec. 2233, p. 588, and cases there cited.

The State's contention that, since there was ample oral evidence of the condition of the tires, reversible error is not reflected by the action of the court in excluding the tires themselves from the consideration of the jury should not be sustained. The jury might not have believed the witnesses for the defense but might have believed their own eyes had they been given an opportunity· to view the tires themselves. This is substantially the holding of this Court in Langford v. State, 123 Tex.Cr. R. 171, 58 S.W.2d 115, and Sherwood v. State, 111 Tex.Cr.R. 453, 14 S.W.2d 1029. .

4. A Mr. McBurnett was called as · a witness for the defense. At the conclusion of his testimony and as he left the witness stand, the court inquired if the witness might be excused. The district attorney indicated that he was not willing to excuse the witness and said, "We want to do some checking on him." The only possible implication from this remark was that the district attorney thought the witness had been lying and wanted time to look into the witness's past so that he might question him further. This amounted to nothing less than unsworn testimony of the district attorney which cast a cloud upon the credibility of the witness and was in my judgment such conduct as should call for a reversal of this case. The jury should be permitted to pass upon the credibility of the witnesses from the evidence and without any sidebar, out of the record insinuations on the part of counsel.

I respectfully dissent.

On Second Motion for Rehearing

MORRISON, Presiding Judge, and DAVIDSON, Judge.

Appellant seeks to file in this case a second motion for rehearing.

For grounds thereof, appellant says that Judge K. K. Woodley, a Judge of this Court who participated in the decision affirming this case, is related to the deceased in this case within the third degree by affinity.

If Judge Woodley was so related, then he is and was disqualified from sitting as a Judge in this case, and inasmuch as his participation therein was necessary to a disposition of the case, such would require that the judgment of affirmance be set aside and the case be re-submitted before a court composed of three qualified judges, for which relief the appellant so prays.

As it appears from the unchallenged and admittedly correct affidavit attached to appellant's motion, Judge Woodley's wife is a first cousin to the wife of a brother of the deceased in this case.

Does such fact show that Judge Woodley is related within the third degree, by affinity, to the deceased? If so, then Judge Woodley is disqualified, by the Constitution (Article V, Section 11) Vernon's Ann.St. and by statute (Article 552, Vernon's Ann.C.C.P.), from sitting as a Judge in this case, and the appellant should be granted the relief he seeks.

In Texas Employers' Ins. Ass'n v. McMullin, Tex.Civ.App., 279 S.W.2d 699, 702, we find Black's Law Dictionary quoted as follows:

"Affinity is the tie which exists between one of the spouses with the kindred of the other: thus, the relations of my wife, her brothers, her sisters, her uncles, are allied to me by affinity, and my brothers, sisters, etc., are allied in the same way to my wife. But my brother and the sister of my wife are not allied by the ties of affinity."

Harwell v. Morris, Tex.Civ.App., 143 S.W.2d 809; Cortez v. State, 144 Tex.Cr.R. 116, 161 S.W.2d 495; and Seabrook v. First

National Bank of Port Lavaca, Tex.Civ. App., 171 S.W. 247, support the above rule.

In the Cortez case it was said [144 Tex. Cr.R. 116, 161 S.W.2d 497]:

"The groom and bride each come within,
The circle of each other's kin,
But kin and kin are still no more
Related than they were before."

See also 30 Am.Jur., Judges, sec. 144, p. 78.

It is apparent that under the rules stated Judge Woodley could not be and was not related by affinity to those who are related to his wife only by affinity—which is the situation here presented.

The application for permission to file a second motion for rehearing is denied.

Judge WOODLEY took no part in the preparation of this opinion.