## TOM WHITE v. THE STATE.

### No. 3488.   Decided May 19, 1915.

**1.—Murder—Evidence—Character of Witness.**

Where, upon trial of murder, defendant complained that the court would not permit him to ask a witness for the State if her husband had not got a divorce from her on the ground of her connection with other men, without showing that either deceased or defendant had any connection with the divorce proceedings, there was no error.

**2.—Same—Evidence—Impeachment.**

Where, upon trial of murder, defendant complained that he was not permitted to ask the witness if it was not a fact that the deceased within a few months prior to his death induced the wives of two or three other men to leave their husbands to associate with him, without showing that these wives were in any way related or acquainted with the defendant, there was no reversible error.

**3.—Same—Evidence—Credibility of Witness.**

Upon trial of murder, there was no error in not permitting the defendant to show that the deceased and another man had a fuss about the latter's wife, in the absence of a showing that the latter killed the deceased or that the defendant was in any way related to said third party or his wife.

**4.—Same—Evidence—Impeachment of Witness.**

Upon trial of murder, there was no error in not permitting the defendant to ask a witness for the State if her husband had not shot her because he caught her in illicit intercourse with a white man; the deceased being a colored man, and not connected, in any way, with the transaction.

**5.—Same—Evidence—Character of Deceased.**

Where, upon trial of murder, the defendant sought to show that deceased had shortly before his death taken the wives of two or three men from their husbands, the court correctly held such testimony inadmissible, it not being shown that the husbands of either of the women were in position to have killed the deceased, who was assassinated in the night-time.

**6.—Same—Evidence—Bail Bond.**

Upon trial of murder, there was no error in not admitting in evidence the bail bond defendant was under to appear and answer to this indictment.

**7.—Same—Evidence—Contradicting Witness.**

Where a witness had testified at the instance of the defendant that he did not remember that another witness said that defendant had a gun, there was no error in permitting the State to refresh the memory of the witness by asking

the questions that were propounded and showing that said other witness had said that he saw the defendant with a gun the night of the killing, and this, although the witness sought to be impeached was a State's witness. Following Self v. State, 28 Texas Crim. App., 398, and other cases.

### 8.—Same—Newly Discovered Evidence.

Where, upon trial of murder and an appeal from the death penalty, the alleged newly discovered evidence was not brought within the rules laid down by this court, and showed a want of diligence in obtaining the alleged newly discovered evidence, there was no reversible error. Following Carrico v. State, 36 Texas Crim. Rep., 618, and other cases. Besides, the testimony was immaterial.

### 9.—Same—Newly Discovered Evidence—Impeaching Testimony.

Alleged newly discovered evidence will not authorize a new trial if the purpose of such evidence be merely to impeach or discredit the witness who testified on the trial. Following Barber v. State, 35 Texas Crim. Rep., 70, and other cases.

### 10.—Same—Evidence—Rehearing—Motion for New Trial.

Where defendant, on the rehearing on his motion for new trial, offered in evidence the testimony taken at the examining trial of the defendant to show that a certain State's witness who testified on the main trial did not testify on the examining trial, and this was not a disputed issue and such examining trial testimony did not affect the testimony of other State's witnesses, and the defendant could have introduced said examining trial testimony during the main trial, there was no error in ruling out said testimony.

### 11.—Same—Sufficiency of the Evidence—Circumstantial Evidence.

Where, upon trial of murder assessing the death penalty, the evidence, although circumstantial, sustained a conviction under a proper charge of the court, there was no reversible error.

Appeal from the District Court of San Jacinto. Tried below before the Hon. L. B. Hightower.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

No brief on file for appellant.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was indicted and convicted of murder, and his punishment assessed at death.

This case was submitted March 2, and at that time was also submitted a motion to postpone the hearing until fall. This we declined to do, but had the clerk notify appellant and his counsel that reasonable time would be granted in which they might file briefs herein. More than two months have elapsed since that time and no briefs have been filed, and we, therefore, judge that counsel in the trial court do not desire to or have not been employed to brief the case on appeal.

The first bill complains that the court would not permit appellant's counsel to ask Catherine Thomas, a witness for the State, if her husband had not got a divorce from her, and on the ground of her connection with other men. The only purpose, it is stated, was to show

the character of the witness. As neither deceased, nor appellant, is claimed to have had any connection with the divorce proceedings, the court did not err in his ruling.

In the next bill it is shown that appellant desired to ask Ben Hopkins "If it was not a fact that Sam Johnson (deceased) had within a few months prior to his death induced the wives of two or three colored men to leave their husbands to associate with him." As it is not proposed to show, nor claimed, if Sam Johnson did do so that the wives of the men were in anyways related to appellant, or that he was even acquainted with them, the court did not err in sustaining the objection to the question. Neither was it error to refuse appellant permission to ask Richard Thomas "If it was not a fact that Sam Johnson and Willis Bass had a fuss about Sam Johnson taking Bass' wife from him." No effort was made to show, nor is it contended that Willis Bass was in position where he could have fired the shot that killed Sam Johnson, nor is it sought to be shown that appellant was in anyways related to Bass or his wife.

The defendant also desired to ask Polly Jenkins, a witness for the State, "If her husband had not shot her because he caught her in illicit intercourse with a white man." Sam Johnson, deceased, was a negro, and it was not proposed to connect him in any manner with the transaction, therefore the court did not err in his ruling.

The appellant also sought to prove by John Cunningham that deceased had, shortly before his death, taken the wives of two or three men from their husbands. The court correctly held such testimony inadmissible. The appellant does not show, nor contend that he could show, that the husbands of either of the women were in position that they could have killed the deceased, nor that the husbands of the women, nor the women were in anyway related to appellant. If deceased was a libertine this would not authorize appellant, in the night-time, to shoot him through a window, if he did so, as contended by the State.

Appellant desired to introduce the bail bond he was under to appear and answer to this indictment. This would be material to no issue in the case.

The only other bill in the record to any proceedings had on the trial is the one relating to the testimony of John Cunningham. Deceased was killed at a church, in the night-time, and while he, deceased, was hanging a lamp. The evidence shows that he was shot by someone standing outside of and in the rear of the church, the gun being held so that a window sill in the church building was powder burned. Aus Smith testified on the trial that on his way to the church, in company with Catherine Thomas, Cindy Reece, and Pokie Harrison, he passed appellant, Tom White, who was near to and behind Thad Williams; that Tom White was riding Beulah Douglass' horse, and had a gun in his hands. He says that as he went in the church he saw appellant ride towards the back of the church, and in a few moments after he got in the church the gun was fired from the back of the church which killed Sam Johnson. The State introduced John Cunningham to prove

he found a man's tracks at the back window, and he followed the tracks for about fifty yards, and found where a horse had been hitched; that he followed the horse tracks for some distance and examined the horse tracks. That there was a gap out of one of the hoofs of the horse, and the track showed it was tolerably long, oblong foot, long heel to it. That he examined Beulah Douglass' horse (which all the evidence shows appellant was riding that night) and one hoof had a gap in it, and the horse had a hoof which was longer than the others. That he saw tracks made by this horse, and they were like the ones he saw on the ground at the back of the church. On cross-examination the witness, at the instance of appellant, testified that the next morning, and on the day of the examining trial, he talked with Aus Smith, and he did not remember him saying that he saw appellant with a gun the night of the killing. On redirect examination the witness was asked if he had not told the district attorney in the presence of Turner Ross, Harvey Lilley, and F. O. Fuller, that Aus Smith had always claimed that Tom White, appellant, had a gun. To which question the witness Cunningham answered, "Yes, sir, he claimed that." As the witness had testified at the instance of appellant that he did not remember Aus Smith saying that appellant had a gun, on redirect examination it was permissible to refresh his memory by asking the questions that were propounded. And it may be said that on recross-examination the witness testified: "In all my conversations with Aus Smith he always claimed Tom White (appellant) had a gun." It is thus seen that appellant sought to impeach the witness Aus Smith by Mr. Cunningham, but when Mr. Cunningham had his attention called to the matter his testimony tended to corroborate Aus Smith and not impeach. What Aus Smith told him would not have been admissible on direct examination by the State, but after appellant had gone into the matter and elicited from the witness the answer he did, then it was permissible for the State on redirect examination to further examine the witness on the matter brought out by defendant. If it should be held that this was an attempt on the part of the State to impeach its own witness, as the witness Cunningham had testified on cross-examination as to facts injurious to the State's case, it would not be error to admit the testimony adduced by the State on redirect examination. C. C. P., art. 815; Self v. State, 28 Texas Crim. App., 398; Blake v. State, 38 Texas Crim. Rep., 377; Clanton v. State, 13 Texas Crim. App., 139.

The only other question raised by the record is that it is claimed the court erred in not granting him a new trial on what he terms to be newly discovered evidence. He attaches to his motion the affidavits of Pokie Harrison and Cindy Reece, both of whom say they would testify that they went to the church that night in question with Aus Smith and Catherine Thomas; that they saw Thad Williams, but did not see appellant, Tom White, on that night. Catherine Thomas had testified on the trial that she went to the church with Aus Smith, Cindy Reece and Pokie Harrison—that she saw Tom White, appellant, near the church. Aus Smith testified on the trial that he went to

the church with these people, and that he saw appellant, Tom White, near the church, and he was right behind Thad Williams; that appellant had a gun, and he saw him ride off towards the back of the church but a few minutes before the gun was fired. All the alleged newly discovered testimony is that Cindy Reece and Pokie Harrison say they would swear they did not see appellant at the time Aus Smith and Catherine Thomas say they saw him. This may be true, but it would have but slight tendency to show that Aus Smith and Catherine Thomas did not see him. The record also discloses that Cindy Reece and Pokie Harrison were in attendance on this trial as witnesses; that they were sworn and placed under the rule. That when Aus Smith and Catherine Thomas testified Cindy Reece and Pokie Harrison were with them when they saw appellant near the church. State's counsel went to see them and asked them if they also saw appellant there near the church, and they informed him they did not. When the two witnesses testified that Pokie Harrison and Cindy Reece were with them at the time they said they saw appellant, both being in attendance on court, it would have been as easy for appellant and his counsel to have seen these two women during the trial as it was immediately after the trial. Aus Smith and Catherine Thomas were the first witnesses placed on the stand by the State, and they both put appellant and his counsel on notice that Cindy Reece and Pokie Harrison were with them. Pokie Harrison and Cindy Reece were then in an adjoining room in attendance on the court, and the slightest diligence would have discovered at that time that they would testify that they did not see Tom White, appellant, on that occasion. In Powell v. State, 36 Texas Crim. Rep., 377, and Halliburton v. State, 34 Texas Crim. Rep., 410, it was held that where it appeared that the proposed witness had been subpoenaed in the case and was in attendance on the court, but was not put upon the witness stand to testify, the testimony does not come within the rule governing newly discovered testimony, and in Carrico v. State, 36 Texas Crim. Rep., 618, it is held that a new trial will not be granted for newly discovered evidence which could have been discovered by the use of ordinary diligence. For other cases see White's Ann. Proc., sec. 1149. In this case the record discloses that by the use of the slightest diligence it could have been discovered during the trial that the two negro women would so testify; they were in attendance as witnesses in this case, and appellant and his counsel were put on notice by the testimony of Aus Smith and Catherine Thomas that the two women were there, and the testimony does not come within the rule authorizing a new trial on account of newly discovered testimony. In addition to this, for them to say they did not see him there that night would not show that Aus Smith and Catherine Thomas did not see him. Thad Williams, a witness for defendant, testified that appellant was with him that night, but he places him at a different point, some half a mile or more from the church.

The affidavit of Clyde Butler shows that his testimony would not be admissible as original testimony, but only admissible as tending to

impeach Aus Smith. It has always been the rule that newly discovered evidence will not authorize a new trial if the purpose of such evidence be merely to impeach or discredit a witness who testified in the trial. Barber v. State, 35 Texas Crim. Rep., 70; Miller v. State, 35 Texas Crim. Rep., 209; Franklin v. State, 34 Texas Crim. Rep., 203; Hauck v. State, 1 Texas Crim. App., 357; Brown v. State, 6 Texas Crim. App., 286; Jackson v. State, 18 Texas Crim. App., 586.

When the hearing on the motion for new trial was had appellant offered in evidence on the motion the testimony taken at the examining trial of appellant, to show, as he contends, that Aus Smith did not testify on the examining trial. This was not a disputed issue on the trial, and the fact he was not called as a witness on the examining trial would not discredit his testimony given on this trial. Appellant also says that he offered this testimony, on the motion for new trial, "to affect the testimony of the witness John Cunningham." Appellant was in possession of this testimony taken at the examining trial during the trial of this case, and if he desired to offer it in evidence, then was the time to do so and not wait and offer it on the hearing of the motion for new trial. We have read the testimony of John Cunningham on the trial of the case, and his testimony given at the examining trial, and we can not see in what way it would affect his testimony given on the trial of the case, and appellant does not suggest wherein it would do so.

The facts in this case show an assassination by someone, the State depending on circumstantial evidence to prove that appellant was the guilty party.

Justice C. M. Harrell testified that a short time before Sam Johnson was killed he had filed a complaint against appellant charging appellant with unlawfully carrying a pistol. He says appellant had plead guilty in his court to making an assault on Aus Smith, and when doing so remarked, "the next man who filed a complaint against him would not live to swear to it in court." Because of this remark he would not tell him who filed the complaint charging him with carrying a pistol, but appellant picked up the docket and looked at it and saw that the complaint had been filed by Sam Johnson (deceased), when he remarked, "The damn long-legged son-of-a-bitch—it will never do him any good."

Catherine Thomas testified that not long before the killing she heard appellant say he was going to kill Sam Johnson if it was the last thing he did.

Ben Hopkins testified that he saw appellant and Sam Johnson on the day that appellant learned that Sam Johnson had filed a complaint against him. That appellant was cursing Sam Johnson; that Sam Johnson would not stop, when appellant said, "You damned son-of-a-bitch, you won't swear against me in court."

Jennie Thomas testified that she is a cousin of appellant, and she saw him at the Harrell church; that appellant was cursing and going on, and said, "he was going to kill Sam Johnson if it was the last

thing he did." She further testified that since Sam Johnson was killed appellant had come to her and tried to get her to say that what he said at the Harrell church was that he was going to kill little Aus Smith, but she declined to do so, when appellant remarked, "You know, Cousin Jennie, if they prove that on me they will hang me."

Richard Thomas, the husband of Jennie Thomas, says he was present and heard this conversation, and that appellant had also tried to get him to get his wife to change her testimony.

Martha Stanley testified she heard appellant talking to Polly Perkins; that appellant was talking about the complaint filed against him by Sam Johnson for carrying a pistol, and said during his remarks that he was going to kill Sam Johnson. That Polly Perkins remonstrated and told him that talk would hang him, when appellant said, "I am going to do it in the dark."

Polly Perkins says this conversation took place, and when she remonstrated appellant replied, "I will kill him in the night and nobody will know who done it." Other witnesses testify to similar threats made by appellant.

Catherine Thomas and Aus Smith say they saw appellant at the church where Sam Johnson was killed. Aus Smith says he had a gun, and was riding Beulah Douglass' horse. The shot that killed deceased was fired through a back window of the church. Aus Smith says as he started in the church he saw appellant ride towards the back of the church. All the witnesses testify that appellant was riding Beulah Douglass' horse that night. John Cunningham says he was called there shortly after the killing, and he kept everyone away from the back of the church until the sheriff came. The sheriff was dead at the time of this trial. Cunningham says the back window sill of the church was powder burned; that tracks were found there, and traced to where a horse had been hitched; the horse made a peculiar track, as stated in his testimony hereinbefore given. He says he found the gun wads, one wad was marked No. 4 squirrel shot. Deceased was shot with buckshot. After the arrest of appellant, officers went to his home and found his gun under the foot of the bed. The gun showed to have been recently fired. It was loaded,—the wad mark No. 4 squirrel shot. When the wad was taken out the cartridge was loaded with buckshot. John M. Harrell testified: "I lived about three-quarters of a mile from the church house where Sam Johnson was killed. I went to that church the day after the killing. After the crowd left that evening or early in the morning I went back there and made a good examination of the tracks around there. I looked at some tracks north of and back of the house. On the pine straw about thirty-four or forty yards from the church it showed an impression like a horse's track. It looked like the horse's tracks started off from back of the church, a little northwest and in a north direction. In one place it looked like where an animal had stood for a few minutes. From that place I saw some impressions in the pine straw; couldn't see much sign apparently only where it led up a little trail. I examined the tracks in the trail. They showed one

of the horse's feet would slip a little; the horse's hind foot would slip a little when he stepped. It had been cut. It showed in that little piece of trail plain for a yard or four or five steps. There was a split in one foot; he didn't lift each foot, but his hind foot, where it hit the ground, it would slip a little. There was a sorrel horse in that community that made a track like that. It belonged to Beulah Douglass. One hind foot of her horse would slip; of course the faster you rode him it would slip a little bit more; anyway, when he walked his hind foot would slip, it seemed like. I looked at the track of the horse after I made the examination up there behind the church. It made the same kind of track as that up there behind the church—slipping. It had a split or gotch in one foot. I had seen that horse's track often and had occasion to notice it before. I could tell his track from any other horse."

Mr. C. M. Harrell testified that the gun was delivered to him by Mr. Cunningham, and he and his brother, Dr. Harrell, examined it. That Dr. Harrell ran his finger in the barrel, and it showed to have been fired in the last day or two. That it was a 12-gauge gun, and the shell in it was marked either No. 4 or No. 6 shot; that when they took off the wad they found the shell loaded with buckshot. These and many other circumstances were shown on the trial, and we think the evidence fully sustains the verdict.

The judgment is affirmed.

*Affirmed.*