## GRADY ALEXANDER V. STATE

No. 26,780. April 7, 1954
Motion for Rehearing Denied June 2, 1954
Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) June 26, 1954
Petition for Writ of Certiorari Denied by Supreme
Court of the United States November 8, 1954

*Mullinax & Wells,* Dallas, for appellant.

*Wesley Dice,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

This is a conviction for nighttime burglary of a private residence; the punishment, five years in the penitentiary.

At the outset, we are confronted with the attack upon the sufficiency of the indictment, the charging portion of which reads as follows:

"Grady Alexander did, then and there unlawfully in the nighttime, commit the offense of burglary, by then and there discharging firearms, to-wit: a shotgun, into the house of Israel Smith, with the intent then and there of committing a felony, to-wit: he, the said Grady Alexander did then and there with malice aforethought, discharge said shotgun into said house with the intent then and there to kill and murder Israel Smith; the said Israel Smith then and there being in said house, said house being then and there the private residence of the said Israel Smith, and then and there controlled and occupied by the said Israel Smith as a dwelling house; and he, the said Grady Alexander, did then and there shoot and discharge said shotgun into said house as aforesaid, without the consent of the said Israel Smith."

It is apparent that the state was here attempting to charge the crime of nighttime burglary of a private residence under Art. 1391, V. A. P. C., and that the felony intended was the murder of Israel Smith, the occupant of the residence at the time. We find it to be sufficient to allege a burglarious entry. Broner v. State, 150 Texas Cr. Rep. 195, 200 S.W. 2d 191, overruling Shackelford v. State, 83 Texas Cr. Rep. 371, 203 S.W. 600, on this point.

Smith, the alleged injured party, was the president of the Western Foundry Company in Tyler. Appellant was the representative of the International Moulders and Foundry Workers Union of North America. The members of the local of that union, about seventy-five per cent of whom were Negroes, were employees of the Western Foundry Company. For some time prior to March 18, 1953, differences had arisen between the foundry company and the local union. In connection with efforts of the union to obtain a renewal of its contract, Smith had sought to have defendant jailed for contempt. Appellant had been heard to say, "Well, I'm going to kill that God damn Jew son of a bitch," referring to Smith.

Smith's one-story brick residence faced Belmont Avenue in Tyler. On the front side of the residence was a bedroom with two windows. Those windows were screened, and on the inside were metal blinds. The walls of the room were nine feet high. The top of the windows was something like 12 inches from the

ceiling, the bottom being some 2½ feet above the floor. The house was situated upon what might be called a double terraced lot with two separate series of steps of five steps each. From the edge of the street to the house was a distance of thirty-five or forty feet. The windows of the bedroom were something like fifteen or eighteen feet higher than the street.

About two o'clock, A.M., on March 18, 1953, Smith was awakened by two shotgun blasts. He went immediately to the bedroom above described, where his twelve-year-old son was sleeping. There he found that No. 6 shot from a shotgun had been fired into the room and through the upper sash of the window. Some of the shot had penetrated the room and lodged in the ceiling and upper window sash and some had penetrated the metal blind. Glass from the window was scattered over the room and the bed. No person suffered an injury as a result of the shooting.

Smith had never occupied the room as his bedroom. The room he and Mrs. Smith occupied as their bedroom was not on the Belmont Avenue side of the house but was situated back of the room above mentioned.

The indictment charged that appellant fired the shots into the house with the intent to murder Smith.

To show such intent, the state relies upon the testimony of Mrs. Charles Hester, who had been indicted for the same offense for which appellant was on trial and who was therefore an accomplice witness, as a matter of law. The trial court so recognized and charged the jury that the witness was an accomplice.

Mrs. Hester testified that on the night of the shooting appellant came to her home and asked to borrow her husband's shotgun. Hester, the husband, delivered it to the appellant, advising him that it was loaded. Appellant then stated to Hester that "he had something big up" and that he wanted to show him something. Thereupon, Mrs. Hester carried her baby to appellant's automobile, which was parked near the front of the Hester home, and was there joined by appellant and her husband a short while later. James Gill and appellant's wife were in the car at that time. At appellant's request, Hester drove the automobile to Belmont Drive, the street upon which the Smith home was situated. Appellant told Hester that he was "going to fix Mr. Smith up," and directed him to drive around the block to a side road, where appellant disconnected the tail lights of the

automobile. The automobile was then driven past the front of the Smith home, at which time appellant fired three blasts from the gun in the direction thereof. Immediately after the shots were fired, appellant said, "I bet that scared him," and then he told Hester to "Step on it." Prior to the shooting, James Gill had told appellant that he had "been in there two or three times, and Mr. Smith sleeps in this front bedroom."

As the car was being driven to the home of Mrs. Alexander, appellant's mother-in-law, appellant cut up the three empty shells from the gun and threw them out of the car. After reaching Mrs. Alexander's home, James Gill, at appellant's direction, hid the shotgun in the "loft" of her home.

The appellant did not testify.

The facts set forth in the two preceding paragraphs are shown, solely, by the testimony of the accomplice witness.

It is insisted that no facts were introduced in evidence sufficient to provide the corroboration of the accomplice witness necessary to authorize the conviction.

It become necessary to examine the record for such corroborative evidence.

Outside of and other than the testimony of the accomplice, it was shown: (a) The shotgun was found by the officers three days after the shooting, at Mrs. Alexander's home. The gun was wrapped in a newspaper and no fingerprints were found thereon. After the gun was found, its possession was traced and, upon the trial, it was identified by the accomplice as belonging to her husband. (b) About three o'clock, A.M., being about an hour or hour and a half after the shooting, appellant and his wife drove into a filling station in their Lincoln automobile and purchased "some Seven Ups." (c) Mrs. J. D. Hester, the mother of Charles Hester, testified to a conversation she had with the appellant at her home in the presence of her son Charles and Mrs. Charles Hester, the accomplice witness. The conversation took place after the appellant, Charles Hester, Mrs. Charles Hester, and others had been arrested and charged with the offense here involved. The witness testified that appellant came to her home at night and asked to see Charles Hester. When her son arrived she left the room temporarily. Upon returning, the appellant, Charles Hester, and Mrs. Charles Hester engaged in conversation, "talking about the shooting out at Israel Smith's

house," in the course of which appellant said, " Charles, look. Now you know that we got into this together, and we've got to get out of it together. . . . We are in this just alike, all of us together, and we got to get out together." Thereupon, the witness stated to appellant: "Charles was in bed asleep and you come over and got him and took him with you. . . . You know that you are old enough to be his daddy, and you have tore down here in one night what I've built up all these nineteen years in Charles." Appellant replied, "I'm sorry. That's the truth, but still, we are in this and we've got to get out." In that connection, the witness further testified: "He (appellant) was just talking to Charles about the union wanted to represent them, just like it was them. He said that they were all five in it together."

The test often applied by this court as to the sufficiency of corroboration is to eliminate from consideration the testimony of the accomplice witness and see if there be inculpatory evidence which tends to connect the accused with the commission of the offense. Durham v. State, 106 Texas Cr. R. 85, 290 S.W. 1092; Fitzgerald v. State, 140 Texas Cr. R. 359, 145 S.W. 2d 190.

Summarizing, it may be said that outside of and other than the testimony of the accomplice, it is shown that: Someone fired two blasts (which is the number Smith said he heard) of No. 6 shot from a shotgun into Smith's home. There was ill-feeling existing between appellant and Smith, and appellant, prior to the shooting, had threatened to kill Smith. On the night of and after the shooting, appellant and his wife drove into a filling station in their Lincoln automobile and purchased some bottles of Seven-Up.

Some time after the shooting into the house, appellant and four others were arrested and charged with the offense which grew out of the shooting.

In discussing the shooting and the arrest or accusation with two of the arrested parties, and in an endeavor to have them agree to the use of the same counsel, the appellant made a statement to the effect that he and the two other arrested parties were "in this together" and had to "get out together," and that it was true that he had gotten Charles Hester out of bed and "took him" with him.

These inculpatory statements of the appellant constituted an admission of guilt and we find the evidence sufficient to corroborate the accomplice witness.

The charge of the court is claimed to be erroneous in several particulars. The first is presented in conection with the contention that the indictment failed to allege that appellant made an assault upon Israel Smith.

Early in the charge, the trial court said: "The indictment in this cause alleging burglary with intent to commit a felony, to-wit assault with intent to murder with malice aforethought, it is necessary that the court define to you both the crime of burglary of a private residence at night time, and also the crime of assault with intent to murder with malice aforethought."

Following this statement, the charge defines burglary of a private residence and defines entry in accordance with the provisions of Art. 1393 P.C. as including "by the discharging of firearms into the house with intent to injure any person therein."

Then follows the statement, in the charge, "The use of any unlawful violence upon the person of another with intent to injure him, whatever be the means or degree of violence, is an assault." Other definitions given by the court prior to the application of the law to the facts include that of aggravated assault with a deadly weapon, murder with malice aforethought, and "murder without malice."

A deadly weapon was defined to be "one which from the manner used is calculated or likely to produce death."

It is apparent that the trial court recognized that, though the indictment did not specifically charge and the proof did not show that appellant actually committed violence upon the person of Israel Smith, it was essential that the state prove that appellant fired the shots with intent to commit murder. In applying the law to the facts the court did not authorize a conviction upon a finding that appellant discharged the shotgun into the house with intent to commit "an assault" with intent to murder, but instructed the jury that if appellant discharged the shotgun into the house with the specific intent to kill Smith with malice aforethought he would be guilty as charged in the indictment.

The legal effect of the charge, as given, is that one is guilty of the felony offense of burglary of a private residence at night if he shoots into the private residence of another with intent

thereby to murder one who is at the time an occupant of the house.

It should be noted that in burglary cases it is not material whether the intent to commit the felony is actually carried into effect or only demonstrated by the attempt, or by some overt act, to be decided by the jury from the facts in evidence. Wilburn v. State, 41 Texas 237; Burke v. State, 5 Texas App. 74.

We find no such error in the charge in regard to the definitions and preliminary instruction as will call for reversal of the conviction. Art. 666 C.C.P.

Appellant next complains that the jury was not instructed to the effect that if appellant fired the gun into the house wilfully or maliciously and without an intent to kill, he would be guilty of a violation of Art. 1339, V.A.P.C. Said article provides, among other things, that if one wilfully or maliciously fires a gun at, against, or into any private residence, he shall be guilty of a misdemeanor and punished as therein provided. The issue of intent, other than arises out of malice or wilfulness, is not an element of that offense.

Appellant requested the following charge, which was given:

"You are instructed that even though you should find and believe from the evidence beyond a reasonable doubt that the defendant, Grady Alexander, discharged a shotgun into the private residence of Israel Smith at nighttime on or about the 18th day of March, 1953, that you cannot and must not convict the defendant unless you further find and believe from the evidence beyond a reasonable doubt that at the very time the defendant discharged the shotgun, if he did, into the home of the said Israel Smith, that at such time there then and there existed in the mind of the said Grady Alexander the specific intent to kill and murder with malice aforethought the said Israel Smith, and unless you so find from the evidence beyond a reasonable doubt, you will return a verdict of not guilty herein."

Thus appellant requested that the jury be instructed to acquit unless they found he intended to murder Smith with malice aforethought and his request was complied with. He cannot therefore be heard to complain that the court failed to give a contrary and conflicting charge, instructing the jury that under such finding the jury should not acquit but might convict him of malicious mischief. We are not called upon to determine

whether the misdemeanor offense referred to is one which comes within the provision of Art. 694 V.A.C.C.P. providing for the submission of lower offenses to the jury, or of whether the failure to submit such misdemeanor offense would so prejudice appellant as to call for a reversal under Art. 666 C.C.P.

Appellant, a white man, attacks the indictment, alleging that race discrimination was practiced against members of the Negro race in the organization of the grand jury which returned the indictment in this case. His authority for such attack is based, he asserts, upon the proposition that the union, of which a large portion were Negroes, was here involved.

Not being a member of that race, appellant could not urge discrimination against members of the Negro race.

The evidence is deemed sufficient and no reversible error appears.

The judgment is affirmed.

### ON MOTION FOR REHEARING

BELCHER, Judge.

Appellant, in his motion for rehearing, complains of the refusal of his motion for a new trial based upon newly discovered evidence. The testimony presented upon this motion shows that Mrs. Hester, who testified on the main trial, stated before the trial that she wouldn't have signed "that confession but they promised (threatened) to take my baby away from me," and after the trial stated "I lied on that witness stand." It is not shown what she lied about, therefore the materiality of same cannot be appraised. The statement about her baby could be used only for impeachment purposes for which a new trial is not ordinarily granted. White v. State, 76 Texas Cr. R. 612, 177 S.W. 93.

No abuse of discretion is shown by the trial court in refusing appellant's motion for a new trial.

Appellant again complains of peace officers appearing in the court room during the trial while armed and of one officer testifying while armed.

Such matters rest within the discretion of the trial court. In the absence of any evidence that the court abused its discretion in regard to the appearance of said officers, no error is shown.

Other contentions re-urged by appellant have been considered, and we remain of the opinion that this cause was properly disposed of originally.

Appellant's motion for rehearing is overruled.

Opinion approved by the court.