**Andrew STUBBS, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**NUMBER 13-16-00352-CR**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed November 9, 2017

Discretionary Review Refused
January 31, 2018

---

**5.** This modification does not affect the $60,000 judgment in Lola's favor as part of the division of the community estate.

John Michael Lamerson, The Lamerson Law Firm, P.O. Box 241, Corpus Christi, TX 78403, for Appellant.

Mark A. Gonzalez, District Attorney, 901 Leopard, Room 206, Corpus Christi, TX 78401, Douglas K. Norman, Assistant District Attorney, 901 Leopard, Room 206, Corpus Christi, TX 78401, for Appellee.

Before Justices Rodriguez, Contreras, and Benavides

**OPINION**

Opinion by Justice Rodriguez

Appellant Andrew Stubbs appeals from the denial of his motion for new trial following his conviction for three counts of sexual assault of a child. By two issues, Stubbs asserts that the trial court erred in denying a new trial on grounds of ineffective assistance of counsel and newly discovered evidence. We affirm.

## I. BACKGROUND

The indictment alleged that on or about October 20, 2015, Stubbs sexually assaulted a child, a felony of the second degree. *See* TEX. PENAL CODE ANN. § 22.011(a)(2), (f) (West, Westlaw through 2017 1st C.S.). The child, whom we refer to as "L.R.," was the fourteen-year-old daughter of Stubbs's long-time girlfriend.

It is undisputed that on January 27, 2016, L.R. filled out a "Victim Impact Statement" in which she recanted her allegations against Stubbs (the "written recantation"). In the written recantation, L.R. wrote that at the time she reported the assault, she had been sad because Stubbs was causing her mother to not pay attention to her, and in order to "get rid of" Stubbs, she lied to a school counselor about being assaulted. L.R. apologized for lying and wrote that Stubbs "never did put a hand on me" or "touched me," that she

felt guilty, and that she loved Stubbs, who "is like a dad to me."

On April 7, 2016, Stubbs pleaded guilty pursuant to a plea agreement with the State. The trial court accepted the State's recommendation, deferred adjudication, and placed Stubbs on community supervision for ten years. During the plea proceedings, the following colloquy took place:

THE COURT: ... Mr. Stubbs, have you gone over with your attorney—

[STUBBS]: Yes, sir.

THE COURT: —regarding the charge pending against you in the indictment? Yes?

[STUBBS]: Yes, sir. At this point I just want my life back.

In response to the trial court's verbal admonitions, Stubbs indicated that he was satisfied with the advice of his appointed trial counsel ("Counsel"); that he understood that the range of punishment was two to twenty years; that he was pleading guilty freely, voluntarily, and not due to coercion; and that he would have "a duty to report and that would last for as long as the rest of [his] life." Stubbs also initialed written statements acknowledging his understanding that the trial court would impose the terms of community supervision, regardless of whether Stubbs agreed to the terms, and his understanding that if the trial court adjudicated guilt, it could sentence him to the maximum term of confinement for the underlying offense.

Eight days later, the State filed a motion to revoke Stubbs's community supervision. The motion alleged that Stubbs committed two violations of the terms of his community supervision: (1) Stubbs possessed a firearm and (2) he was seen near the residence of L.R.'s mother. Stubbs was appointed a new attorney.

At the hearing on May 4, 2016, Stubbs informed the trial court that he was ready

to proceed on the State's motion to revoke, subject to his right to file a motion for new trial regarding the original plea proceedings.[1] Based on the State's evidence, which Stubbs does not challenge on appeal, the trial court found the State's allegations true, revoked Stubbs's community supervision, adjudicated guilt on three counts of sexual assault, and pronounced concurrent sentences of eighteen years' confinement on each count.

On May 9, 2016, Stubbs filed a motion for new trial on the basis of ineffective assistance of counsel and the discovery of new evidence.

## A. Newly Discovered Evidence

In his motion for new trial, Stubbs alleged three forms of newly discovered evidence. The first was a recording in which L.R. again recanted her allegation that Stubbs sexually assaulted her (the "video recantation"). However, at the hearing on Stubbs's motion for new trial, he agreed that he was aware of the video recantation prior to his guilty plea; as his niece Trisha Caley had informed him of the video and described its content. Stubbs further testified that he did not ask to view the video, even though he knew that Caley had given a copy to Counsel.

The second form of new evidence was the results from a forensic kit which showed that Stubbs's DNA was not present in any sample collected from L.R. on the day after the alleged assault. Stubbs agreed that prior to his plea, Counsel had mentioned that a sample had been collected from L.R., but Stubbs testified that Counsel never explained that a test was going to be performed or what the results could mean for his case.

The third item of new evidence was a Facebook post by L.R.'s mother on October 22, 2015—two days after the alleged assault and one day after Stubbs's arrest. The post read, "Yay I'm single thank god but hell it's worth it I don't give a dam [sic]."

Stubbs argued that he was entitled to a new trial based on the three items of newly discovered evidence.

## B. Ineffective Assistance of Counsel

The remainder of the evidence at the hearing focused on Stubbs's claim that his plea was not voluntary because of ineffective assistance. In support of this claim, Stubbs offered his own testimony and elicited testimony from the following: Counsel; Stubbs's second appointed attorney, who represented Stubbs at the hearing on the State's motion to revoke community supervision; and his niece, Caley, who captured the video recantation.

### 1. Stubbs's Testimony

Stubbs testified that Counsel was deficient in multiple ways. As mentioned previously, Stubbs testified that Counsel never advised him of the DNA test. For another, Stubbs testified that Counsel lost his copy of the video recantation. When he was provided with another copy, Counsel responded that it was "irrelevant" because he was already working on a plea deal with the State.

Stubbs further testified that his Counsel briefly mentioned that L.R. had also made a written recantation on January 21, 2016, but Counsel did not describe the content of that recantation, show it to Stubbs, or explain its impact on the case. According to Stubbs, Counsel never showed him any of the other discovery received from the State except for briefly showing him one

1. At the revocation hearing, the State agreed that Stubbs's participation in the proceedings would not prejudice his right to file a motion for new trial.

item of evidence "through the glass" at Stubbs's facility.

More generally, Stubbs testified that during the course of the representation, Counsel met with him five times for roughly five to ten minutes each, and between meetings, neither he nor his family could reach Counsel because he did not answer his phone. Stubbs testified that he wrote to the trial court multiple times concerning Counsel's non-responsiveness, and in response, the trial court ordered Counsel to visit Stubbs.[2]

Stubbs also testified that Counsel misinformed him about the length and nature of his sex-offender registration. Specifically, Stubbs testified that Counsel described it as simply reporting once per month and paying a fee, and that Counsel did not inform Stubbs that he would have to register throughout his life or mention the requirements to take classes, to have a special license, to submit to lie-detector testing, or to refrain from using the internet.

Stubbs testified that he did not ask Counsel to seek a plea deal in the sense of pleading guilty, but wanted "pre-trial probation," that is, "[t]o get out with bond with restrictions or ankle monitor or something." Stubbs testified that on the morning of his plea hearing, Counsel presented Stubbs, for the first time, with the State's plea offer of eight years' confinement or ten years' probation, whereupon Counsel explained that this was the best for which Stubbs could hope. Stubbs testified that at Counsel's insistence, he then signed the trial court's written admonitions without reading them, simply initialing where Counsel indicated. Stubbs testified that Counsel neither explained deferred adjudication, nor told Stubbs he could take the

case to trial. According to Stubbs, Counsel's actions left him with the impression that Counsel did not want to represent him further.

According to Stubbs, he accepted the offer not because he was guilty, but because "I was fed up with being in jail for so long on something I didn't do. I wanted my freedom back and my life back. With y'all offering the eight years, he said that was the best it was going to get." Stubbs elaborated, "At that point, I just wanted it over. And I thought I could get back to my life by accepting this probation and I was terribly wrong in that fact."

### 2. Testimony of Counsel

Counsel testified to a much different version of his representation of Stubbs. According to Counsel, he met with Stubbs at least five times for, on average, thirty minutes to an hour. Counsel explained that he only communicated with Stubbs if there was an update on the case, but would always seek to answer any questions. He also spoke with Stubbs's mother and niece for roughly ten to fifteen minutes at a hearing. Counsel agreed that outside of these meetings, he did not speak with Stubbs or his family due to Counsel's policy against talking about cases over the phone. Counsel denied that the trial court ever ordered him to visit Stubbs or that he was aware of the Facebook post that L.R.'s mother wrote on the day following Stubbs's arrest.

Counsel testified that he went over the discovery with Stubbs several times. This included an explanation of L.R.'s medical records, an "extensive" discussion of L.R.'s written recantation—which he also provided to the trial court at a bond modification

---

**2.** The record contains a notation in which someone affiliated with the 319th District Court of Nueces County urged Counsel to visit Stubbs, though the identity of the person who made the notation is not evident.

hearing—and a review of the video recantation captured by Caley. According to Counsel's assessment of the video recantation, L.R. appeared to be "under a lot of pressure; a lot of blinking of the eyes, some stressful looks in the face." Counsel averred that, based on his review of the record, he believed L.R.'s mother was pressuring her to recant. Counsel further testified that the video recantation he reviewed was roughly ten minutes long, whereas the version that Stubbs proffered at the new trial hearing was just over four minutes long and appeared to have been edited.

As to his advice concerning the DNA test, Counsel related to Stubbs that he did not know how long testing would take, and that in the event the DNA matched Stubbs, seeking a second opinion of the DNA evidence would take up to a year. Counsel also explained that if the DNA results matched someone else, this would also be bad for Stubbs:

> I'm trying to remember, because we went back and forth on that. And I can just give you what I probably said, if you want me to really say in fact I said it or not, but if it came back negative, it could show possibly that the child may have been promiscuous and that could be a double-edged sword and swing on him, because that's also taking advantage of someone who was promiscuous. So no matter where you turn, it's like a minefield.

As to the plea agreement, Counsel maintained that Stubbs asked him to seek a plea agreement for probation, but Counsel resisted, stating that it would be best to see what discovery revealed first. After discovery was returned, Stubbs was "adamant" about pursuing a plea and probation, so Counsel contacted the State and negotiated an offer, which was presented to Stubbs two or three weeks before the plea hearing.

Counsel testified that on the morning of the plea hearing, he summarized the most relevant admonitions for Stubbs, including the fact that a deferred plea could lead to a maximum sentence if he was adjudicated. He further explained the conditions of community supervision, including regular reporting, fines, and limitations on Stubbs's contact with L.R. Counsel also testified with some uncertainty concerning his advice on registration as a sex offender, explaining that it was his understanding that registration is "usually ... for life," but that the statute changed often, so it was difficult to be certain.

Finally, Counsel testified that his last involvement in the case was a conversation with prosecutors four days after the plea hearing. At the prosecutor's request, Counsel told the prosecutor what he had and had not explained to Stubbs prior to the plea, including whether Counsel had gone over the conditions of community supervision.

### 3. Other Testimony

Caley testified that in the six months that Counsel represented Stubbs, she attempted to contact Counsel roughly 150 times in an effort to discuss the case and give him the video recantation she captured. However, Caley testified that she was unable to contact Counsel or provide him with the video recantation until she approached him at a hearing. The first hearing that appears in the record is a bond-reduction hearing on March 21, 2016.

Stubbs also called his second appointed attorney, who testified that although L.R. drafted the written recantation on January 27, Stubbs was not told of the recantation until March 21—and even then, Stubbs was not given a copy of the recantation. The second attorney also offered his opinion that Stubbs was "not advised of the

consequences of the plea" or of the procedures applying to deferred adjudication.

## C. Subsequent History

On June 21, 2016, the trial court denied the motion for new trial without entering findings. On July 5, 2016, Stubbs filed this appeal, in which he challenges the denial of his motion for new trial on the grounds of ineffective assistance and newly discovered evidence.

## II. TIMELINESS OF APPEAL

■ As a preliminary matter, we address the State's argument that Stubbs did not timely file his appeal. The State points out that the trial court entered its order of deferred adjudication on April 8, 2016 and that Stubbs did not appeal that order until July 5, 2016—eighty-eight days later. The State asserts that because Stubbs did not perfect his appeal within thirty days of the time he was placed on deferred adjudication, he lost the right to challenge defects in those proceedings in any subsequent appeal. *See* TEX. R. APP. P. 26.2(a)(1); *Manuel v. State*, 994 S.W.2d 658, 661–62 (Tex. Crim. App. 1999).[3]

The State acknowledges that Stubbs filed a motion for new trial on May 9, 2016. In a typical case, such a motion would be considered timely, *see* TEX. R. CIV. P. 4; TEX. R. APP. P. 21.4(a), and it would extend the deadline for filing a notice of appeal to ninety days. *See* TEX. R. APP. P. 26.2(a)(2).

However, relying on *Donovan v. State*, the State argues that in cases involving deferred adjudication, a motion for new trial is invalid. 68 S.W.3d 633, 636 (Tex. Crim. App. 2002) (en banc). The State draws our attention to cases which hold that defendants with deferred adjudication status may not use a motion for new trial to extend the appellate timetable. *See Murray v. State*, 89 S.W.3d 187, 188 (Tex. App.—Dallas 2002, pet. ref'd); *Garcia v. State*, 29 S.W.3d 899, 901 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (per curiam) (holding that because appellant was on deferred adjudication, his motion for new trial was a "nullity" that did not extend the time for filing his notice of appeal).

The State is correct that in *Donovan*, the court held that generally there can be no motion for new trial from an order of deferred-adjudication community supervision. *See* 68 S.W.3d at 636. For support, *Donovan* relied upon appellate rule 21, which defines a "new trial" in a criminal matter as "the rehearing of a criminal action after the trial court has … set aside a *finding or verdict of guilt*." TEX. R. APP. P. 21.1(a) (emphasis added); *see·Donovan*, 68 S.W.3d at 636. *Donovan* held that because there is no "finding or verdict of guilt" in a deferred adjudication, "there is nothing that can be set aside so as to create an occasion for implementation of Rule 21." 68 S.W.3d at 636.

---

**3.** The State agrees that Stubbs retained the right to challenge his later revocation proceedings because he filed his appeal within the thirty-day appellate window for those proceedings. *See* TEX. R. APP. P. 26.2(a)(1). However, the general rule is that a defendant may raise issues relating to the original deferred-adjudication proceedings only in an appeal taken from those proceedings. *Manuel v. State*, 994 S.W.2d 658, 661–62 (Tex. Crim. App. 1999); *see Wright v. State*, 506 S.W.3d 478, 481 (Tex. Crim. App. 2016) (elaborating on this rule and outlining exceptions that do

not apply here). The State contends that because the appellate window for the deferred adjudication proceedings had expired by the time Stubbs perfected his appeal, Stubbs was precluded from challenging defects in the deferred-adjudication proceedings, including those defects related to the voluntariness of his plea. *See Williams v. State*, 58 S.W.3d 137, 138 (Tex. Crim. App. 2001) (per curiam) (holding that in an appeal from the revocation of community supervision, the appellant may challenge "a jurisdictional issue, but not the voluntariness of the guilty plea").

Here, however, there was a finding of guilt by the time Stubbs filed his motion for new trial. The trial court revoked Stubbs's community supervision and found him guilty of a second-degree felony on May 4, 2016, just twenty-six days after the court granted deferred adjudication. The trial court sentenced Stubbs on May 6, and Stubbs filed his motion for new trial to set aside that finding of guilt on Monday May 9, which was still within the procedural window for appealing the deferred-adjudication proceedings. See Tex. R. Civ. P. 4; Tex. R. App. P. 21.4(a); see also Manuel, 994 S.W.2d at 661–62.

Donovan itself recognizes that under such a scenario, "a motion for new trial may be filed" concerning the original order of deferred adjudication. See 68 S.W.3d at 638.[4] Under Donovan, Stubbs's motion was a valid and timely effort to set aside a finding of guilt, regardless of whether adjudication was initially deferred. See id.[5]

Accordingly, the timely motion extended the appellate timetable. See Tex. R. App. P. 26.2(a)(2). Stubbs filed this appeal within eighty-eight days. Thus, Stubbs's appeal was a valid and timely challenge to alleged flaws in the deferred-adjudication proceedings. See Manuel, 994 S.W.2d at 661–62. Accordingly, we reject the State's argument and proceed to the merits of Stubbs's appeal.[6]

## III. Ineffective Assistance of Counsel

By his first issue, Stubbs argues that he received ineffective assistance of counsel, and that his plea of guilt was therefore unknowing and involuntary.

### A. Standard of Review

Because claims of ineffective assistance of counsel involve mixed questions of law and fact that often contain subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses, an appellate court should review the trial court's rulings on the matter for an abuse of discretion. Odelugo v. State, 443 S.W.3d 131, 137 (Tex. Crim. App. 2014) (describing standard of review for denial of a motion for new trial based on ineffective assistance). We reverse the trial court's ruling only if it was clearly erroneous and arbitrary, such as when "no reasonable view of the record could support the trial court's ruling." Id. Where the trial court has not made explicit fact findings in denying a motion for new trial, the reviewing court should imply all findings necessary to support the ruling "when such implicit factual findings are

---

4. Donovan advises that if a defendant desires a new trial regarding the original order of deferred adjudication, the defendant should seek "adjudication within thirty days." Donovan v. State, 68 S.W.3d 633, 635 (Tex. Crim. App. 2002) (en banc) (citing Tex. Code Crim. Proc. Ann. art. 42.12, § 5(a) (West, Westlaw through 2017 1st C.S.)).

5. Because Stubbs was no longer on deferred adjudication at the time of his motion for new trial, we find each of the authorities cited by the State to be distinguishable. See Murray v. State, 89 S.W.3d 187, 188 (Tex. App.—Dallas 2002, pet. ref'd); Garcia v. State, 29 S.W.3d 899, 901 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (per curiam); see also Mestas v. State, 214 S.W.3d 1, 3 (Tex. Crim. App. 2007).

6. The State also argues that because he entered a plea bargain, Stubbs lacked the right to raise his issues on appeal under appellate rule 25.2(a)(2), which provides that in a plea bargain case, a defendant may appeal only (A) those matters raised by pre-trial motion and ruled on before trial, or (B) with the trial court's permission. Tex. R. App. P. 25.2(a)(2); see Manuel, 994 S.W.2d at 662 (defining rights of appeal concerning deferred adjudication). We disagree. The trial court expressly granted permission by certifying Stubbs's right to appeal under rule 25.2 on May 4, which was still within the appellate deadline for the deferred-adjudication proceedings.

both reasonable and supported in the record." *Johnson v. State*, 169 S.W.3d 223, 239 (Tex. Crim. App. 2005).

## B. Applicable Law

The longstanding test for determining the validity of a guilty plea is whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant. *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). A guilty plea is not knowing or voluntary if made as a result of ineffective assistance of counsel. *Ex parte Moussazadeh*, 361 S.W.3d 684, 689 (Tex. Crim. App. 2012). When a defendant enters his plea upon the advice of counsel and subsequently challenges the voluntariness of that plea based on ineffective assistance of counsel, the voluntariness of such plea depends on (1) whether counsel's advice was within the range of competence demanded of attorneys in criminal cases and if not, (2) whether there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Ex parte Morrow*, 952 S.W.2d 530, 536 (Tex. Crim. App. 1997) (en banc). Under the first prong, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In determining whether an applicant would have pleaded guilty but for counsel's deficient advice, we consider the circumstances surrounding the plea and the gravity of the alleged failure material to that determination. *Ex parte Moody*, 991 S.W.2d 856, 858 (Tex. Crim. App. 1999). Where the alleged deficiency is failure to discover exculpatory evidence, assessment of "reasonable probability" under the second prong "will depend in large part upon a prediction whether the evidence likely would have

changed the outcome of a trial." *Ex parte Briggs*, 187 S.W.3d 458, 469 (Tex. Crim. App. 2005).

A reviewing court must be highly deferential and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Ex parte Niswanger*, 335 S.W.3d 611, 615 (Tex. Crim. App. 2011), *abrogated on other grounds by Cornwell v. State*, 471 S.W.3d 458 (Tex. Crim. App. 2015). We judge the effectiveness of counsel by the "totality of the representation," not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight. *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012).

For a guilty plea to be a voluntary and intelligent choice, the defendant must be aware of the plea's direct consequences that are punitive in nature. *See Anderson v. State*, 182 S.W.3d 914, 917–18 (Tex. Crim. App. 2006) (en banc); *Mitschke v. State*, 129 S.W.3d 130, 135 (Tex. Crim. App. 2004). When a defendant is advised of the direct, punitive consequences of his plea, his ignorance of a collateral or remedial consequence does not render the plea involuntary. *Mitschke*, 129 S.W.3d at 135. If a given consequence is definite and largely automatic, then it is a direct consequence. *Id.* Although the sex-offender registration requirement is a direct consequence of a guilty plea for a triggering offense, it is generally viewed as a nonpunitive measure that will not necessarily render a plea involuntary. *Anderson*, 182 S.W.3d at 918; *Mitschke*, 129 S.W.3d at 136.

## C. Analysis

Stubbs testified as to several deficiencies in Counsel's performance. However, many if not most of the deficiencies can be addressed as reasonable credibility determinations that the trial court resolved in favor of the State. *See Odelugo*, 443 S.W.3d at 137; *Johnson*, 169 S.W.3d at 239. For instance, the trial court could have reasonably believed Counsel's testimony that he thoroughly discussed the case—including the evidence, community supervision, and the nature of the plea—instead of Stubbs's report that Counsel explained these aspects only minimally or not at all. As to who sought the plea agreement, the trial court could have disbelieved Stubbs's account and instead believed Counsel's explanation: Counsel was hesitant to seek probation before discovery was returned, but Stubbs was "adamant" about seeking a plea agreement, and Counsel did his best to fulfill his client's wishes, negotiate a favorable plea, and timely present it to Stubbs.

Similarly, it is undisputed that Counsel did not fully explain all of the written admonitions. Counsel testified that he instead attempted to summarize the most relevant ones. But the trial court could have reasonably found that Counsel advised Stubbs "of the direct, punitive consequences" of his plea, and that the remainder concerned collateral or remedial consequences which did not render the plea involuntary. *See Mitschke*, 129 S.W.3d at 135; *Johnson*, 169 S.W.3d at 239.

Other portions of the testimony, even if true, do little to show the inadequacy of Counsel's representation. For instance, Counsel agreed that he never showed the video recantation to Stubbs but testified that he "extensively" discussed the recantations with Stubbs, and Stubbs testified that he received information about the content of the video recantation from Caley. *See Ex parte Harvin*, 500 S.W.3d 418, 418 (Tex. Crim. App. 2016) (Alcala, J., concurring) ("The primary evidence on which [applicant] relies in this habeas application is the recent recantation of the complainant, but he entered into the agreed plea bargain even after he knew about her former recantation."). Under this view of the record, Stubbs's review of the video recantation would be mostly cumulative of and possibly inferior to: (1) Counsel's legal assessment of the recantations from the perspective of an experienced attorney, and (2) further description by Caley, the very person who captured the video recantation. *See Odelugo*, 443 S.W.3d at 137.

It is also undisputed that Counsel did not explain the intricacies of sex-offender registration, including lie-detector testing, special licensing, etc. But the court of criminal appeals has held that registration is not among the punitive consequences that are essential to an intelligent plea, and it stands to reason that the ancillary effects of registration are even less likely to be a source of harmful error. *See Anderson*, 182 S.W.3d at 918; *Mitschke*, 129 S.W.3d at 136.

However, Stubbs testified to at least three flaws which cannot be dismissed as credibility determinations or as having limited relevance to Counsel's adequacy: (1) Counsel's advice concerning the forensic testing of swabs taken from L.R.; (2) Counsel's unresponsiveness to Stubbs's family and, consequently, the limited consideration of the video recantation before the plea was entered; and (3) Counsel's failure to investigate the facts and discover the Facebook post.

First, and most important, were the flaws in Counsel's advice concerning DNA analysis. The record reasonably supports two versions of events: according to

Stubbs, Counsel never mentioned the fact that a DNA test was pending or explained its potential impact on his case; according to Counsel, he discussed DNA testing, but told Stubbs that no matter the outcome of the test, the results would likely be harmful to his case. *See Johnson*, 169 S.W.3d at 239. However, even under Counsel's version of events, it is somewhat difficult to imagine a sound basis for Counsel's advice. *See Niswanger*, 335 S.W.3d at 615; *Washington v. State*, 394 S.W.3d 39, 43 (Tex. App.—Houston [1st Dist.] 2012, no pet.) ("We conclude that, if it is ultimately determined that appellant's trial counsel furnished appellant with 'false information' related to the DNA evidence ... this conduct would constitute deficient performance."); *see also Ex parte Munoz*, No. WR-28,195-06, 2015 WL 375925, at *1 (Tex. Crim. App. Jan. 28, 2015) (order per curiam) (holding that if counsel misled defendant about DNA evidence in his case, this would warrant habeas relief).

Nonetheless, under Counsel's version of events, it is possible to imagine a valid basis for his advice: that Counsel was unartfully attempting to explain to Stubbs how a prosecutor could present counterarguments to even the most favorable DNA evidence. *See Odelugo*, 443 S.W.3d at 137; *see also Ex parte Pena*, No. 04-14-00884-CR, 2015 WL 9002851, at *9 (Tex. App.—San Antonio Dec. 16, 2015, pet. ref'd) (not designated for publication) (rejecting claim that trial counsel was deficient in "dismiss[ing] the importance of exonerating DNA evidence," and concluding that counsel was actually attempting to explain how the evidence was subject to strong counterarguments; "[e]xplaining to a client how the State might use or present evidence, whether the DNA evidence would or would not exonerate [defendant], is clearly within the objective standard of reasonableness ...."). Under this view, Counsel's advice was within the range of competence

demanded of attorneys in criminal cases, and it therefore does not fall afoul of the first prong of our analysis. *See Ex parte Morrow*, 952 S.W.2d at 536.

■ Second, it cannot be denied that Counsel did not respond to Stubbs's family as they repeatedly attempted to contact him. Counsel testified that any failure to answer the many phone calls by Stubbs's family over the course of six months was based on Counsel's policy of never discussing cases over the phone. This policy does not explain, however, why Counsel did not respond and arrange an in-person meeting to interview the family and gather evidence—including the video recantation. *See Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527. Third, it is undisputed that Counsel did not investigate L.R.'s family so as to discover the impeaching Facebook message that Rodriguez posted on the day following Stubbs's arrest. Counsel explained that his only response to the Facebook message would have been to instruct Stubbs to "show[ ] it to the DA." *See id.*

However, even assuming that either of these flaws established a departure from acceptable standards of representation under the first prong—which we do not decide—neither one establishes that Stubbs was prejudiced under the second prong. *See Ex parte Morrow*, 952 S.W.2d at 536. Counsel testified that he eventually met with Stubbs's family at a hearing, interviewed them, and received the video recantation, and any delay in retrieving the video did not cause the video to be, say, inadequately presented before a jury. *Cf. Johnson v. State*, 172 S.W.3d 6, 12 (Tex. App.—Austin 2005, pet. ref'd) (finding ineffective assistance where counsel did not discover, until mid-trial, that an audiotape of an arrest had exculpatory content, and counsel failed to present the exculpatory portion to the jury). Instead, the record

permits the view that Counsel relied on the video as leverage in his plea negotiations with the State—a process that led to a favorable plea arrangement for Stubbs. As to the Facebook message, this evidence would have provided impeachment value, but we cannot say that it would have warranted the prediction of a different outcome at trial. *See Ex parte Briggs*, 187 S.W.3d at 469.[7] These alleged deficiencies do not demonstrate a reasonable probability that Stubbs would not have pleaded guilty under the second prong of our analysis. *See Ex parte Morrow*, 952 S.W.2d at 536.

Considering the totality of the representation, *see Ex parte Jimenez*, 364 S.W.3d at 883, we cannot say that the trial court abused its discretion in determining that Stubbs had not demonstrated ineffective assistance. *See Odelugo*, 443 S.W.3d at 137. Accordingly, we overrule Stubbs's first issue.

## IV. NEWLY DISCOVERED EVIDENCE

By his second issue, Stubbs contends that three forms of newly discovered evidence should have warranted a new trial: the Facebook post by L.R.'s mother; the DNA results; and the video recantation.

### A. Applicable Law

▮ A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial. TEX. CODE CRIM. PROC. ANN. art. 40.001 (West, Westlaw through 2017 1st C.S.). In order for a defendant to be entitled to a new trial on the basis of newly discovered or newly available evidence, a four-pronged test must be satisfied:

(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial;

(2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence;

(3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and

(4) the new evidence is probably true and will probably bring about a different result in a new trial.

*Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014).

### B. Analysis

▮ Stubbs does not argue that the video recantation itself is newly discovered evidence. Instead, Stubbs argues that he "discovered" it in the sense that he did not actually see the video before he pleaded guilty, and did not review the video until he was released on community supervision following the plea hearing. But Stubbs agreed that prior to his plea, his niece Caley described the content of the video recantation to him and provided a copy to his attorney. *See Villarreal v. State*, 79 S.W.3d 806, 814 (Tex. App.—Corpus Christi 2002, pet. ref'd). Under the first prong, Stubbs failed to show he was un-

---

7. Moreover, considering Counsel's testimony concerning the circumstances that surrounded the plea, *Ex parte Moody*, 991 S.W.2d 856, 858 (Tex. Crim. App. 1999), the trial court could have also determined that if Counsel neglected to discover this evidence, it was because of a circumstance that Stubbs himself created: Stubbs's haste to enter a plea in exchange for community supervision. *See Odelugo v. State*, 443 S.W.3d 131, 137 (Tex. Crim. App. 2014); *see also Voorhees v. State*, No. 01-08-00026-CR, 2009 WL 3805822, at *6–7 (Tex. App.—Houston [1st Dist.] Nov. 6, 2009, pet. ref'd) (not designated for publication) (rejecting ineffective assistance claim where record supported inference that appellant insisted upon plea for community supervision despite his knowledge of the evidence suggesting his innocence and despite attorney's advice).

aware of the video recantation. *See Carsner*, 444 S.W.3d at 2.

Stubbs next argues that the DNA results constituted newly discovered evidence. We have already determined that the record would reasonably support a finding that Counsel informed Stubbs of the pending DNA analysis. The question, therefore, is whether Stubbs's decision to plead guilty before the return of the DNA results shows a lack of diligence. *See id.*

"While any defendant who is deciding whether or not to plead guilty would certainly prefer to be apprised of his exact odds of an acquittal at trial, the reality is that every defendant who enters a guilty plea does so with a proverbial roll of the dice." *Ex parte Palmberg*, 491 S.W.3d 804, 809 (Tex. Crim. App. 2016). "There could be any number of situations in which evidence the defendant initially thought admissible is actually inadmissible, a witness thought to be available is actually unavailable, or, *as in this case, evidence thought to be subject to forensic testing is, in fact, not testable.*" *Id.* (emphasis added). The Texas Court of Criminal Appeals recently cited this stance from *Ex parte Palmberg* to reject a claim of newly discovered evidence, reasoning that the defendant showed a lack of diligence: if the criminal defendant "wanted to know whether a motion to suppress would be successful, she could have filed and litigated one." *See State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex. Crim. App. 2017).

In pleading guilty, Stubbs accepted the probabilities of his proverbial roll of the dice. *See Ex parte Palmberg*, 491 S.W.3d at 809. At the time of his plea, it was thought that samples collected from L.R. contained sperm that would be subject to forensic testing. That thinking later turned out to be incorrect. But Stubbs eschewed the possible outcomes of such testing and accepted the promise of immediate release from confinement in exchange for community supervision—which Stubbs does not dispute that he violated. We therefore cannot say that Stubbs demonstrated diligence in securing this evidence. *See Arizmendi*, 519 S.W.3d at 149; *Ex parte Palmberg*, 491 S.W.3d at 809; *Carsner*, 444 S.W.3d at 2.

Finally, Stubbs raises the Facebook post from the day after his arrest, in which L.R.'s mother wrote, "Yay I'm single thank god but hell it's worth it I don't give a dam." We do not doubt that "this newly discovered evidence was possibly useful to the defense" in impeaching L.R. and her mother at a trial, but "we cannot agree that the evidence would have materially altered the outcome of the trial had it been made available." *See Burdick v. State*, 474 S.W.3d 17, 23 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (internal quotations omitted); *see also Alexander v. State*, 160 Tex.Crim. 460, 274 S.W.2d 81, 86 (Tex. Crim. App. 1954) (op. on reh'g) (rejecting new trial based on newly discovered impeachment evidence concerning a witness's motive to lie); *Ayala v. State*, 511 S.W.2d 284, 288 (Tex. Crim. App. 1974) (similar).

We have determined that each of the forms of evidence advanced by Stubbs fail to satisfy at least one prong of the controlling test for newly discovered evidence. *See Carsner*, 444 S.W.3d at 2–3. Accordingly, we overrule Stubbs's second issue.

## V. Conclusion

We affirm the judgment of the trial court.